THE STATE v. ADAMS.

1. A sheriff, under the act of 1819, has no authority to give a casting vote between two candidates for sheriff.
2. Such a power not being expressly given, cannot be allowed by implication.
3. Where two candidates for sheriff obtain an equality of votes, no election is effected.
4. In such case a vacancy exists, such as may be filled by executive appointment till the next general election.
5. A citizen may by accepting a beneficial public office, waive a constitutional franchise; so an act providing that a public officer shall vote only in a certain event, is not unconstitutional.
6. The original election returns are admissible evidence to prove the true number of votes given, although they had been for some days in an exposed situation, and altered in some respects, their fairness and alteration being matters for investigation by the jury.
7. Courts of justice cannot inquire into the reasons of the executive for making an appointment to fill a vacancy, when the right exists. Therefore, petitions made to the Executive, shewing the motive for the appointment, are not legal evidence to impeach the officer's right.

This was an information in the nature of a *quo warranto*, filed in the Circuit Court of Marengo county, at the May term, 1829, on the relation of John E. Anderson.

The information alleged, that James H. Adams for the space of nine months and more, had used and still used without authority, the office of sheriff of Marengo county, which office and the privileges and immunities thereof he usurped &c; wherefore he was required to answer to the State by what warrant he claimed to use and exercise said office, &c.

The defendant appeared and filed his answer, alleging, "that at the general election held for Marengo county on the first monday in August 1828, the relator, John E. Anderson, one Henry Chiles and Thomas Adams, were candidates before the people for the office of sheriff; that Anderson and Chiles received an equal number of votes for said office, and more than Thomas Adams; that on computing the votes from the different precincts, a mistake was made in the number of votes given for Anderson; that under the influence of said mistake, the late sheriff proclaimed Anderson duly elected; that on the Saturday after the election, the mistake was discovered, and the sheriff then re-examined the returns and found that Anderson and Chiles had each received an equal number of votes, when the sheriff gave his casting vote in

JULY 1829.

The State
v.
Adams.

favor of Anderson, and forwarded his certificate of the result, to the secretary of State, as follows: "I Benjamin Barton, sheriff of the county of Marengo, do hereby certify, that at an election held on the first Monday of August instant, for the purpose of electing a sheriff &c. The votes being equal for John E. Anderson and Henry Chiles, I, myself have given the casting vote to John E. Anderson, in consequence of which he is duly elected sheriff of Marengo county, &c. Given under my hand and seal, at office, the 18th August 1828.

(signed,)  B. BARTON, sheriff. [SEAL.]"

The defendant further alleged, that Anderson did not receive a majority or plurality of votes at the election, but only an equal number to that received by Chiles, whereby, in consequence of the expiration of the commission of B. Barton, the office became vacant and subject to be filled by appointment by the Governor; that there had been no election held since. He further alleged that on the 25th of September 1828, the Governor issued his commission under the great seal, appointing him, James H. Adams, sheriff of Marengo county, which commission he produced, and which is as follows:

"The State of Alabama, and by the authority of the same. John Murphy Governor of said State to James H. Adams, greeting. Whereas the election of sheriff of Marengo county held on the first Monday in August last has been contested, of which due notice has been given to the executive department: Now therefore, in pursuance of the power vested in me, and in order to provide in this contingency for the demands of the public service, I do by virtue of the power and authority in me vested, hereby commission you sheriff of the county of Marengo as aforesaid, to hold the said office until superseded by the determination of the contested election, or otherwise by the constitution and laws of the State: You are hereby therefore authorized and required to do and perform all and singular the duties incumbent on you as sheriff of Marengo county, according to law, and the trust reposed in you. Given under my hand and seal of the State, at the town of Tuscaloosa, this 25th day of September in the year 1828, and of the Independence of the United States the fifty third.

(L. S.)            (signed,)        JOHN MURPHY.
By the Governor,

JAMES I. THORNTON, *Secretary of State.*"

Under this commission the defendant alleged that he was duly qualified, had given bond, had taken on himself and continued to discharge the duties of the office."

The solicitor and counsel for the relator demurred to this plea, and the demurrer was by the Court overruled. A general replication was then filed, and issue joined, and at the same term, a verdict was found for the defen- dant; on which judgment was rendered for him.

By a bill of exceptions taken by the relator at the trial, it appears that the relator requested the Court to instruct the jury, that if they believed from the evidence that Anderson and Chiles had an equal number of votes, and the sheriff had given the casting vote to Anderson, he had a right to do so, and that thereby Anderson was duly elected. This charge the Court refused, and instructed them that the sheriff had no right to give the casting vote in an election for sheriff, and that if there was a tie be- tween the candidates, there was no election.

The relator offered to prove that there had been a no- tice given to Anderson to contest his election, which contest had not been prosecuted, but relinquished, and that a petition had shortly after the election been pre- sented to the Governor, soliciting the appointment of Mr Adams, for particular reasons and particular purposes. This evidence the relator's counsel offered as an explana- tion, and as containing as it was said, a full reason why the commission issued to Adams. This evidence, on the objec- tion of the defendant, was rejected by the Court.

The defendant offered in evidence the certificates of the votes given at the different precincts, to prove that a tie actually existed between Chiles and Anderson. It was proved that the certificates had been received, and that a count was made thereon on Tuesday, the day after the election, on which the sheriff had declared Anderson elect- ed by five votes over Chiles, and that then the papers were left open and subject to public inspection, and were frequently inspected, and in fact that one of the returns had been altered so as to make the votes of Turkey-creek precinct read and be in figures, eleven for Chiles, when it should have been nine. The relators counsel objected to the introduction of said certificates, for any purpose whatever; but the Court overruled the objection and per- mitted them to be read, and instructed the jury to give them what weight they might think them entitled to as the *data* on which the count was made on Tuesday and Saturday.

JULY 1829.

The State
v.
Adams.

The relator's counsel requested the Court to instruct the jury, that as the returns from the different precincts in the county were directly from the hands of the managers of the election on Tuesday, when they were first counted out, and not liable to be altered, they afforded better evidence of the true state of the votes than they could on Saturday when they were counted the second time, and that this was a conclusion of law and not a matter of inference. This charge the Court declined to give. They further requested the Court to instruct the jury, that the sheriff had a right to give his vote as a citizen, even after the polls were closed, which was also refused.

The relator in this Court assigns for error, the overruling of the demurrer to the defendant's plea, and also the several decisions made as shewn by the bill of exceptions.

SHORTRIDGE, for the State.

LYON and KELLY, for the appellee.

GAYLE, for the appellant, in conclusion.

By JUDGE TAYLOR. It is insisted for the relator, 1st, that he was legally elected, and is entitled to the office; 2d, but if he was not, that there was no vacancy in the office which authorized an executive appointment; and therefore, the defendant is not authorized to discharge the duties of the office. 3. But if the Court should not come to either of these conclusions, that the judgment must be reversed and remanded, because the Court below erred in rejecting the evidence offered by the relator, and receiving that to which he objected. I will reverse the order in which these points were discussed in the argument, and consider the third point in the first instance.

The relator, on the trial of the case in the Circuit Court, offered in evidence some papers purporting to be representations to the Governor in the form of petitions of many of the citizens of Marengo, by which he was induced to commission Adams, with a view to show, as he alleged, that fraud was practised upon the Governor in procuring from him the commission; which were excluded. That the judiciary should inquire into the inducements which operated upon a co-ordinate branch of the government in making an appointment which is confided to its discretion, would indeed be a delicate and unenviable duty. It would be declaring that the courts were

more competent to determine upon the qualifications of citizens for office, or at any rate, that they were more deliberate in investigating those qualifications than the executive, to whom the law has confided the appointment. But in what manner, and at what time, is such an investigation to be made? Is it to be done upon the request of the Governor? and are we to wait until such request is made? Or is any person who conceives himself either wiser, or more anxious for the pulic good than the chief officer of State, to give the information to the Courts? And if we are to inquire into the manner in which the Governor has made an appointment, what hinders us from also looking into elections made by the people, and excluding men from the offices to which they have been elected, because we believe such election was secured by fraudulent practices? This doctrine is fraught with consequences of a nature too plainly intolerable to be entertained for a moment. The Court was therefore right in rejecting the testimony offered by the counsel for the relator, as specified in the record. It was equally so in receiving the returns from the precincts made to the sheriff. These returns form the *data* upon which the sheriff is to arrive at the result of the election. They are evidence to him of the number of votes given in at each precinct, and for whom. If they had been locked up when received by the sheriff, and never inspected or seen by any other person, they would certainly have formed a part of the evidence to be submitted to the jury in trying the question of right to the office. As it is from these returns that the sheriff ascertains the result, it is conceived they are admissible before the jury, to shew that he was authorized to draw such a conclusion from the premises before him. It is true they would be far from conclusive, but liable to countervailing testimony, going to show error from mistake or design. Does then the circumstance of those returns having remained open to public inspection, and an alteration having been made in one of them, render them incompetent? It seems to me this question answers itself. These facts, with respect to them, are to be ascertained, and if so, must they not be before the Court, before such inquiry can be made? Such circumstances are to be weighed by the jury in determining what credit they will give to the returns, but cannot affect their competency.

As to the second point, it is believed thiscase is in substance one between the relator, Anderson, and the defen-

dant, Adams; that it is the true interest of the State that every citizen should have his rights, and therefore, the State will lend its name to a citizen to assert those rights, when they affect his title to a public office of which another is in the enjoyment. But this Court does not believe that either law or policy requires that one man in the occupancy of an office shall be put out upon the complaint of a stranger. It is good policy that offices shall be filled, particularly so important an office as that of sheriff, not that they should be vacant. Therefore, if the relator has not right to the office, the inquiry is terminated. But, as that branch of the subject is more immediately connected with this part of the investigation than any other, I will proceed now to inquire whether, if it be admitted the relator was not elected, there existed such a vacancy in the office as authorized the Governor to appoint? The words of the Constitution, relating to the subject, are to be found in the Laws of Alabama, page 924, section 24, and are as follows, viz: "A sheriff shall be elected in each county by the qualified electors thereof, who shall hold his office for the term of three years, unless sooner removed, and who shall not be eligible to serve, either as principal or deputy, for the three succeeding years. Should a vacancy occur subsequent to an election, it shall be filled by the Governor, as in other cases; and the person so appointed shall continue in office until the next general election, when such vacancy shall be filled by the qualified electors; and the sheriff then elected, shall continue in office for three years." This section provides that elections for this office shall regularly take place; therefore, it would be a strained and forced presumption to suppose that there would be no election held, as that would be directly in the teeth of the provision. The whole object of the section is to secure the means by which the offices of this description throughout the State shall be filled, and the terms for which they shall be held. The convention had their eye fixed upon the object of keeping the office always occupied. They determine that public policy requires that these officers shall be elected by the people, and that the same persons shall only retain the office for three years. It is easy to provide that elections shall be held at stated periods, and it is as easy to determine that the individual shall only continue in office three years; but the convention would make no provision by which the office would be at all times filled by the people. There might be vacancies, and as it would require time to fill

such vacancies by the people, it is necessary that the duties of the office shall be discharged in the mean time. The convention thought it wiser that the election by the people should be postponed until the next general election for members of the General Assembly, &c. than that they should be specially convened for that particular purpose, and that in the mean time the Governor should make an appointment. The convention, therefore, intended to provide for filling the office by an election in the first instance, and a vacancy by executive appointment when it occurred. They took it for granted elections would always be held in conformity with the provisions of the constitution, and they proceeded to provide a mode of appointment, in the event of the election by the people not effecting the object of providing a sheriff for the next three years; that is, in case the office should be vacant from any cause, after such election was held. The words of the constitution are, "should a vacancy occur subsequent to an election," &c. clearly meaning, should a vacancy occur subsequent to the time prescribed by law at which a sheriff is to be elected, not to the time when a sheriff is actually elected. This construction, and no other, completely fulfils the intention of the constitution in keeping an incumbent always in the office. The former sheriff holds his office untill the next election has terminated; and there can never be a vacancy for a longer time than it would require to apprise the Governor that it is necessary to fill it. When the time fixed by law for the general election arrives, the people meet at the polls and give in their votes, should they fail to elect a sheriff by being divided as to their choice, the general election terminates, and a vacancy in the office of sheriff takes place; it is "subsequent to an election." There was no vacancy before, as the former sheriff continues in office until that time. There is one now, because no election is effected, and it is within the authority of the Governor to fill it.

But it is argued that, in this instance, the commission shows that the Governor did not intend to make an appointment but for a limited period, viz: until the contest was decided, and the contest being abandoned, the defendant is no longer authorized to act in the office. It was clearly the intention of the Governor to appoint the defendant for the whole time that the office would have been vacant without such appointment, and the manner in which he has expressed such intention is not material.

The main inquiry now arises, was the relator elected sheriff of Marengo county at the general election? As there is a difference of opinion among the members of the Court on this subject, and as it is of great importance to the parties, I shall consider it with some minuteness, and endeavor to give with plainness the reasons which operate upon my mind in bringing me to the conclusion to which I have arrived, and which is the result of my best judgment and most mature reflection. To determine this question, it is only necessary to ascertain whether the sheriff, Barton, was authorized to give the casting vote to the relator, the people having given an equal number of votes to him and to Chiles. For I consider it incontrovertible, that if he had that power immediately at the close of the election, he had it whenever he learned for the first time that it was necessary to use it, provided he exercised it in a reasonable time after receiving such information.

It is contended that the sheriff, Barton, had no power to give the casting vote, for two reasons. 1st. because there is no statute authorizing him to do so. 2. If there is, such statute is unconstitutional. I will examine the last reason first.

The constitution, article 3, section 5, declares, "every white male person of the age of twenty-one years or upwards, who shall be a citizen of the United States, and shall have resided in this State one year next preceding an election, and the last three months within the county, city, or town, in which he offers to vote, shall be deemed a qualified elector." It is insisted in argument that every citizen of the description contained in this section, has a right to vote; that sheriffs, as well as others, are included; and that to prohibit their voting, except in a particular event, is depriving them of this constitutional privilege.

That this objection is specious, is certain, but I do not think it will bear the test of scrutiny. Constitutions are always intended to lay down general principles, to define boundaries by which the different departments of the government are to be limited, and to secure the great rights and privileges of the people; such at least, are the objects of our federal and state constitutions. These great principles, thus declared, are to be acted upon by the different departments of the government, and some of them to be brought into active operation by the aid of subsequent en-

·actments of the legislative department. Constitutions are intended to be of a permanent nature, liable to amendment it is true, yet guarded against the hand which would rashly and inconsiderately make alterations in their provisions. It is obvious then, that a constitution must be liberally construed, with the view of effectuating the intention of its framers; and that the history of the times in which it was framed, the manner most efficient in securing its objects, the restraints intended to be imposed and the privileges intended to be granted, must all be taken into consideration in giving a construction to those instruments. What then was the privilege intended to be secured by the 5th section of the 3d article? Certainly the right of suffrage to all the persons included within its provisions; and it is equally certain that no department of the government, nor all of them combined, have the power to divest an individual of this right, otherwise than as is prescribed by the constitution. Any citizen however, is authorized to refuse to exercise this privilege. He may do it in various ways; as by refuing to vote at an election, voting for only one officer when he might have voted for five or six, absenting himself from an election, &c. The right of suffrage then, is a privilege granted by the constitution to the citizen, intended to secure his own rights. But if the citizen can refuse to exercise this privilege, he may also relinquish it for a time, to secure to himself a greater advantage. This may be tested by other provisions of the constitution. The 10th section of the declaration of rights declares, that "the accused has a right, in all prosecutions by indictment or information, to a speedy public trial by an impartial jury of the county or district in which the offence shall have been committed." This has always been considered as securing a privilege to the accused, and that he might, under the statute authorizing a change of venue, relinquish this right, and be tried elsewhere. So, if the General Assembly declares that no sheriff shall vote at an election, except in case of a tie, it deprives no man of his privilege; for no man is bound to become a sheriff, but if he does become one, he, for the time, relinquishes his right of suffrage, to be exercised only in the excepted case, for which he receives a greater good. He does this too, with the view in part of securing an election, the very object intended to be effected by this provision of the constitution. It is the policy of the constitution that an election should be made by the people, and therefore, an act of the

JULY 1829.

The State
v.
Adams.

General Assembly tending to advance this object, would be consonant with the best public policy. Nor does the idea that the sheriff may be authorized to give a casting vote, militate at all against the opinion herein before advanced, that a failure to elect such officer occasions a vacancy in the office. If such provision existed, the election would not have closed until the sheriff had ascertained the tie, and given his vote.

The position, that an officer may be compelled to relinquish a part of his constitutional privileges as a citizen to promote the convenience of the community, was well sustained by the counsel for the relator, in the cases put of clerks, &c. &c. being required to keep their offices at the several places of holding the courts of the different counties, which necessarily compels them to live there; and to be compelled to reside at a particular place, is as certainly an unconstitutional restriction upon citizens generally, as any which can be imagined. Offices are created, and officers appointed for the convenience and advantage of the people, and so long as these objects are kept in view in legislative enactments with regard to them, their rights are not infringed. The constitutions of all the States prescribe the general qualifications of electors; in several, the sheriff is required by statute to give the casting vote; and in none, so far as I am informed, has the constitutionality of such a law been questioned. I am therefore of opinion that such a statute would not be unconstitutional.

I come now to examine whether such a statute does actually exist in our statute book.

To prove that there does, much has been advanced in argument, which would have been sound logic if addressed to the legislative branch of the government, but which ought not to influence this Court in arriving at a conclusion. That such a law would be politic, will not be disputed by me; but because I am of this opinion, it does not follow that others must agree with me, far less that I am for this reason to determine that there is such a law. It has been urged that the constitution secures the right to the electors of each county, to elect members to the General Assembly, sheriffs, and clerks; and that unless some person in the county is authorized to give a casting vote in the event of a tie, there would be a failure to elect, and the office must remain vacant; or the Governor may appoint some individual to fill the vacancy, however obnoxious such appointment might be to the people of the

county. Receive this argument in all its latitude, and it defeats itself; for it has not yet been contended by any, that the constitution gives to any person a casting vote to produce a preponderance, when an equal vote has been given to two candidates; but all admit, that if such a power exists, it is conferred alone by the act of 1812, and that of 1819, which recognizes it; for as to the provision in the 7th section of the schedule to the constitution, all agree that it was only intended to provide for the first election under the constitution, and this object being effected, it became a dead letter. Suppose the act of 1812 had been expressly repealed by that of 1819, so far as related to the casting vote of the sheriff, who then would have given such vote? Certainly any other citizen would have been equally authorized to do so, with the sheriff. The answer is plain, none would have had such authority; a vacancy would have occurred, not so destructive to the true interests of the people as might be apprehended, as it could at once be filled by the Governor of their choice; and after the revolution of a few months, the electors of the county would again meet at the polls, either to confirm the appointment made by their Chief Magistrate, by electing the man commissioned by him, or to put some person in his place, in whom they more implicitly confided.

The decision of this case then, turns simply upon this point, does the act of 1819 vest in the sheriff the power of giving the casting vote, in the event of an equal number of votes being given to two persons, candidates for the office of sheriff? The 3d section of that act, which is entitled "an act to regulate elections," &c. declares, "that hereafter the court house shall be the place of holding general elections in each and every county throughout this State, for the purpose of electing Governor, members to Congress, members of the Generl Aassembly, sheriffs, and clerks. The election at the court house, as aforesaid, shall be holden on the first Monday, and day following, in August, in each and every year." The 3d section provides, "that the elections aforesaid shall be conducted by the sheriff and managers appointed, in the same manner as heretofore by law directed." In order to ascertain the manner in which elections were conducted before the passage of that act, it is necessary to recur to the act of 1812, passed by the Legislature of the Mississippi Territory, entitled "an act to amend and reduce into one the several acts regulating elections." The 5th section of

31

JULY 1829.

The State
. v.
Adams.

this act, after specifying the manner in which votes shall be given in, viz: by ballot, &c. proceeds thus: "But when two persons shall have an equal number of votes, the returning officer shall have the casting vote, but shall not vote in any other case whatsoever." At that time, members of the House of Representatives were the only officers elected by the people. Does this provision, for deciding in the event of a tie, form a part of the "manner of conducting the election?" If it does, then the relator was duly elected; if it does not, he was not. There is certainly a great distinction between the manner of conducting an election, and the election itself. By "the manner of conducting the election," I understand the formal part of the election, viz: the mode of voting, the mode of receiving and registering the votes, of computing them, &c. The word *manner* has never been considered as including substance, but form only, and the word *conducting*, certainly cannot be synonymous with *effecting*. Now the giving a casting vote is clearly not a part of the "manner of conducting," but it is effecting the election. The qualifications of the electors is substance, the manner of determining upon those qualifications is form. Under the provision which we are considering, it devolved upon the managers to determine whether the voters possessed the necessary qualifications to vote; but the law must definitely prescribe those qualifications. In the event of a tie, the giving of the casting vote is as substantial a part of the election, and more so if possible, than the qualifications of the electors. It is so far from being the manner of conducting the election, that it is absolutely making the election. When the polls are closed, and the votes are counted out, the sheriff and managers have completed their duty as respects the manner of conducting the election, and if no election of any officer is effected by reason of a tie, and any individual is authorized then to vote, he is as completely the elector, as if no other person had been permitted to vote at all. This is placing in the hands of the sheriff, a great and important privilege, too important, I conceive, to be given by mere implication, unless it was necessary to the security of some great interest. I believe therefore, that the power of the sheriff to give such vote, ought not, and legally cannot, be extended by implication; and that therefore, he has not the power to give the casting vote, except in the instance expressly provided for, viz: in the event of a tie between candidates for the House of

Representatives; and that the argument *ab inconvenienti* cannot in this instance, be permitted to weigh with the Court.

The practise of extending statutes far beyond their legitimate meaning, indeed of often giving them a construction directly in opposition to the plain intention of those who made them, has been in many instances carried to a most unwarranted length. That statutes, which have in view the remedy of a particular mischief, should be construed by the Courts so as to carry that intention into effect, is, in the general, a plain proposition; but when the formal mode prescribed for carrying into execution the provisions of one statute, is recognized and prescribed as the mode of carrying into execution the provisions of another, to determine that all the substantial enactments of the first are included in the last, might produce much confusion; nor can I perceive the necessity for these extended constructions. Did our General Assembly meet but once in some dozen years, the argument *ab inconvenienti* would possess great force indeed; but when there are annual sessions, surely it is safe and more becoming in the judicial tribunals to suggest to this more immediate organ of the people, the amendment which they consider politic, than to make it themselves.

I consider the policy upon which our happy institutions are based, of keeping separate and distinct the three departments of the government, as the one best calculated to secure the permanence of our liberties; and while I would watchfully guard against the encroachments of the executive or legislative departments upon the independence of the judicial, I would be equally vigilant not to pass the boundary laid down for me as a judge. While all shall act in this way, we shall move on harmoniously, and the great object of the constitution, the security of the people's rights, will be perfectly effected.

I consider it unnecessary to dwell upon the consequences produced by the announcement made by the sheriff, Barton, that the relator was duly elected. This can have no possible effect. If he had received a minority of votes, this declaration could not make him a sheriff, either *de facto* or de *jure;* if he had received a majority, he was entitled to the office whether declared so or not.

I am of opinion the judgment should be affirmed, and of this opinion are a majority of the Court.

By JUDGE LIPSCOMB. I have not formed an opinion on the point whether the act of 1812 was abrogated or not, by the constitution; but I most fully concur in the construction given to that act in the above opinion.

By JUDGE SAFFOLD. An election was held at the time appointed, when Barton, the sheriff then in office, computed the votes, and proclaimed the relator elected by a majority of five votes; five days afterwards, on suggestion of a mistake, he re-examined the certificates returned by the managers, from the different precincts; the result of which was, that Anderson and H. Chiles had received an equal number of votes; whereupon the sheriff gave the casting vote in favor of the relator, and made out and forwarded to the department of State a certificate thereof. An attempt having been made to contest the election of Anderson, and notice thereof given to the executive department, the Governor proceeded to fill the office, and commissioned the defendant, Adams, "to hold the said office until superseded by the determination of the contested election, or otherwise by the constitution and laws of the State." No method for contesting elections for sheriff having been prescribed by statute, nothing farther appears to have been done in the contest until it was renewed in this judicial form. The contest appears to have been attempted in the first instance, and the executive appointment to have been made on the supposition that Barton, the returning officer, had no right to give the casting vote; or if he had, it was not done in time. These points involve all the difficulty of the case.

The right of the returning officer to give the casting vote in the event of a tie in the election of sheriffs, is denied, on the ground that the act of 1812, under which, as modified and extended, the authority is claimed, does not apply to elections for sheriff. It is true this act of the Territorial Legislature was passed with exclusive reference to elections for Representatives to the General Assembly, and at that time no other State or county officer was elective by the people; hence the expressions of the act embrace Representatives only. I think there can be no difficulty in deciding, that unless the application of the act of 1812 has been extended by subsequent legislation, no change in the form of the government, or extension of the right of suffrage, would confer the right of giving the casting vote in the election of other officers.

But I maintain that the constitution and statutes of the State have given the same right in the election of all county officers in which the sheriff is the returning officer. The fact that a different regulation exists in the election for Governor, can furnish no argument against the right in the other elections mentioned, for in this, various considerations prove that the General Assembly is the only competent authority to act. In the event of an equal division of votes in the election of Representatives to Congress, the several returning officers of the district shall determine which of the candidates shall be the Representative. *a* This may be regarded as one of the many indications of the policy of the State, to maintain inviolable the right of suffrage, by confining the election and ultimate choice of all officers to the electors of the district or county entitled to the franchise. The right of the returning officer to give the casting vote for sheriff, may, I conceive, be fairly derived from the statutes of 1812, regulating elections for Representatives to the General Assembly, conjointly with the 7th section of the schedule to the constitution, and the act of 1819. *b* The schedule directs, that the first election for Governor, Representatives to Congress, members of the General Assembly, clerks of the several Courts, and sheriffs of the several counties, "shall be conducted in the manner prescribed by the existing election laws of the Alabama Territory." Had there been a tie in the election first held under the constitution, for any State Senator, can a reasonable doubt be entertained as to the authority of the returning officer to have given the casting vote? All admit he had this right in an election for Representative, for the act of 1812 had expressly so directed; the constitution had continued in force all the Territorial laws not repugnant to it, and had further declared as above recited, that the election for members of the General Assembly, and all the other officers mentioned, should be conducted in the manner prescribed by the existing election laws of the Alabama Territory. What more could have been necessary to place the conduct or entire management of the elections of Senators and Representatives on the same footing? My present object is to prove that members to both branches of the Legislature must be elected in the same way, and that it is impossible that a difference can exist between the election of Senator and sheriff, as respects the right of the returning officer to give the casting vote.

*a* Laws of Ala. 284.

*b* Laws of Ala. 274.

JULY 1829.

The State
v.
Adams.

While I admit Courts have no authority, in order to carry into effect their own notions of expediency, to extend the operation of statutes, by construction, to persons or things not within their legititimate meaning, though they be equally within their reason, I am equally zealous to maintain, that we should not torture language or pervert its usual acceptation, to produce difficulty or inconvenience, or to search for a *casus omissus* in legislation; but that we are bound to interpret all statutes according to their true intent and meaning, and such as are of a remedial nature, liberally and beneficially. Then when it is declared that the elections authorized by the constitution shall be conducted in the manner prescribed by the then existing laws of the Alabama Territory, I can understand the language in no other sense, than that such elections are not only to be commenced, but finally consummated by the same rules; nor can I conceive, while two or more candidates have an equal number of votes, that the election has been completed. It is true the authority derived from the constitution as referred to, had exclusive reference to the first elections to be held under it; but the Legislature was equally competent to legislate on the subject, and at the succeeding session, shortly after the first elections, an act was passed to regulate the elections of the several officers before mentioned, by which it is provided that the elections aforesaid, "shall be conducted by the sheriff and managers appointed in the same manner as heretofore by law directed."*a* This language is substantially the same as that employed by the constitution, and must evidently refer, as there was no other, to the election law of 1812, which authorized the returning officer to give the casting vote.

*a* Laws of Ala. 274.

Neither Senators nor clerks of either Court, more than sheriffs, were elected by the people in 1812. The government being territorial, had no Senators, and the clerks and sheriffs were appointed by the Executive. Hence it appears to me impossible that the election of either of these officers, or of Representatives, can be governed by rules different from the others. The Legislature, as well as the Convention, has arranged them in the same class for election, and explicitly declared that it shall be conducted in the same manner prescribed by the pre-existing election laws. Under the different construction, if a tie occur in the election of a Senator, there is no authority competent to determine the election. The Senate

alone, has a constitutional right, when convened, to judge of the election, and return; till then nothing can be do:.e, and the Senate have no power to give the casting vote, nor has the Governor that power, or any authority to fill the appointment, and the consequence of their declaring a vacancy and ordering a new election would be, that the county would remain unrepresented during the greater part, or all the session. Similar inconvenience would result from the same cause in reference to sheriffs, unless a tie *ipso facto* constitutes a vacancy subject to executive or judicial appointment, and this according to our polity would be a most novel idea. And though a commission has issued to Adams, who was not a candidate, the Governor has not viewed the difficulty in this case, in the light of an ordinary vacancy; he expresses in the commission as the cause of making the appointment, that the election had been contested; nor has any authority been discovered for an executive appointment in cases of contested elections. These are cases in which I conceive both law and usage have directed that the person ostensibly elected, and having the certificate of the returning officer, shall exercise the office until the contest be terminated in favor of one of the parties, or until the tribunal authorized to try and determine the contest shall declare the office vacant: and if the law, as in this case, has provided no other mode of deciding the contest, the judiciary is always competent. The official acts of the person in office under color of right, during the pendency of the contest, are valid as the acts of an officer *de facto*, if not *de jure*. The direction of the constitution on this head is, that if a vacancy occur in the office of sheriff subsequent to an election, it shall be filled by the Governor, as in other cases, until the next general election. Shortly after this election was held, and the difficulty had arisen as described, the Governor commissioned Adams, who otherwise had no claim to the office. At a later period, ascertaining there was no prospect of a speedy decision of the contest, he issued a commission to Anderson pursuant to his certificate of election; but Adams refusing to yield his authority, continued to exercise the functions. It is conceded that a commission does not confer the right to an elective office, except in case of vacancy, as directed by the constitution, and that it is only evidence of the right, which may be resisted, and either sustained or annulled, according to the true result of the election.

Then, as it is not conceived that any such vacancy ex-- isted as is contemplated by the constitution, and inasmuch as the sheriff had certified that Anderson was duly elected, I find it necessary to express an opinion that the commission to Adams was unauthorized, and that on a full view of the merits, that said relator was legally and constitutionally elected; that such is the only legitimate conclusion, whether it be considered that he had a majority of five votes, as first calculated, or that the number of votes was equal for him and another, as supposed on the second examination of the certificates, five days afterwards, and that the sheriff then gave him the casting vote. As the delay in determining the election was produced by a mistake, rendering the casting vote unnecessary, and the law does not limit the time, it cannot affect the relator's title to the office.

It has also been contended in favor of the defendant, that the provision in the election law authorizing sheriffs to give the casting vote, and denying them the right to vote in any other case, is unconstitutional, for the reason that it affects their right of suffrage. This objection will be but slightly noticed, as it is not sustained by the opinion of a majority of this Court.

Besides the reasons already advanced to prove that the right to give the casting vote is consistent with both the law and constitution, it may be also observed, that other privileges intended to be secured by the constitution, and which are deemed inestimable, cannot be insured without the existence of this right. The constitution guarantees to the electors of each county, the right to elect members to the General Assembly, sheriffs, clerks, &c. Then, the effect of a denial of authority to some one in the county to give the casting vote in the event of a tie is, that the county must remain for a time without any such officer, or that the Governor, residing in a distant part of the State, may control the result according to his will, by appointing whom he pleases, however offensive to the county; and true as it is, that this state of things may not often occur, yet every election is subject to it, and the principle is the same as if the occurrence was more frequent. And it is also important to reflect, as insisted by the relator's counsel, that if it be admitted that the mere act of contesting an election creates a vacancy, the inevitable consequence is, that any designing individual, by merely exhibiting the form of a contest, may deprive the electors of the county of their constitutional right of suf-

frage and defeat their will, however united in any case, by transferring the appointment to the Governor, and this may be repeated as often as elections shall be held. A more palpable invasion of the elective franchise cannot be well imagined; and the principle being established on constitutional grounds, the remedy would be placed beyond the control of the Legislature.

This would be a state of things than which nothing could be more foreign from the intention of the Convention. And to all the objections urged on the ground that the individual rights of the returning officer would be withheld, by denying him the common right of suffrage, I think a sufficient answer has been given by the relator's counsel, that it is an usual and necessary incident to the office which the incumbent has voluntarily accepted; that the sheriff cheerfully submitted to this qualification of the right, has duly exercised it, and that it neither did or could affect the franchise of any other person. It may be also observed that the official situation of a sheriff gives him extraordinary influence in elections; his right of suffrage is secured whenever his vote can give to the candidate of his choice a plurality; and then he has the peculiar right of voting with a knowledge of the state of the polls, whereby he may secure his first, second, or other choice. These advantages would appear to compensate for any rights yielded. These are all the points which I think necessarily involved in the contest; and according to my view of the question, Anderson was, and is entitled to the office. Hence my dissent from the opinion of a majority of the Court.

JUDGE PERRY also dissented, and concurred in the opinion delivered by JUDGE SAFFOLD.

Judgment affirmed.

JUDGE COLLIER, presided below, and did not sit.