THE STATE, ex rel. ATTORNEY GENERAL *VS*. PAUL.

1. It seems that *quo warranto* would be the proper remedy to test the right of an individual to an office or franchise, the duties and privileges of which he may be exercising and enjoying.
2. The Supreme Court has no authority, on the relation of the attorney general, in behalf of the State, to enquire into the constitutionality of an appointment by the legislative department, of a judicial officer.
3. Thus, where the legislature, having established a new judicial circuit, at the same session, elected one of its own members the judge thereof---it was held, on an information, in the nature of *quo warranto*, filed by the attorney general, in the name of the State, that this Court had no power to control the appointment, by any inquiry into the constitutional power. of the legislature, to make the election.

At January Term, 1833, of the Supreme Court of Alabama, an information, in the nature of a *quo warranto* was filed in this Court, by Peter Martin, Esq. Attorney General of the State of Alabama, wherein the said attorney general gave the Court to understand and be informed, that John W. Paul, Esquire, for the space of one month then last past, had, and then still did, use, without warrant or legal grant, the liberties and privileges of the office of Judge of the eighth judicial Circuit of the State of Alabama; all which liberties and privileges of the said office, the said John W. Paul had, and then still did usurp, to the great damage and prejudice of the State of Alabama.

And the said attorney general, for, and in behalf of the said State of Alabama, further gave the Court

to understand and be informed, that the said John
W. Paul, for the space of one month, then last past,
and more, had used, and still did use, the liberties
and franchise of judge of the Circuit Courts of the
eighth judicial circuit of the State of Alabama, in
violation of the existing constitution of said State;
for, that the said John W. Paul was, on the sixth
day of August, 1832, duly and constitutionally elect-
ed, from the county of Dallas, in the State aforesaid,
a representative in the legislature of said State, for
and during the term of one year, then next following:
and, in pursuance of said election, he, the said John
W. Paul, did, on the seventh day of November, in
the year last aforesaid, in the town and county of
Tuskaloosa, take the several oaths prescribed by law,
for members of the house of representatives, and then
and there did take his seat, as a member of the legis-
lature, in the house of representatives of said State:
and afterwards the legislature of said State, by an
act, approved on the eleventh day of January, 1833,
did create and organise the eighth judicial circuit of
the State of Alabama—thereby, then and there *cre-*
*ating* the office of judge of said Circuit, to be filled
by the election of said legislature: and afterwards,
to wit, on the eleventh day of January, 1833, the
said John W. Paul, was elected by the said legisla-
ture, the judge of the said eighth judicial circuit,
created as aforesaid—he, the said John W. Paul, then
and there being a member of the said house of re-
presentatives. Whereupon, the said Attorney Gene-
ral, on the part and in behalf of the said State, prayed
the consideration of the Court here, in the premises;

and that due process might be awarded against him, the said John W. Paul, in that behalf, to answer the State of Alabama, by what warrant he claimed to exercise, use and enjoy the liberties, privileges and franchise of said office.

At June Term, 1833, John W. Paul, having been notified, appeared, by counsel, and protested that this Court did not possess jurisdiction to enquire into the premises, and for cause showed—

That by an act of the legislature of this State, approved the eighteenth day of December, 1832, certain new counties were laid off, on the lands, to which the Indian title had then been recently extinguished; that the designation of new counties, made by this act, was required and directed to be so done, by the seventeenth section of the sixth article of the constitution of this State. That, by the seventh section of the fifth article of the said constitution, it is provided, that Circuit Courts shall be held in each county, at least twice in every year; and, by the first section of the same article, the Circuit Court is *created*. That, by the fifth section of the same article, it is provided, that the State shall be divided into convenient circuits; and that each circuit shall contain not less than three, nor more than six counties; and for each circuit there shall be *appointed*, a judge, who shall, after his appointment, reside in the circuit for which he may be appointed. That, in consequence of the establishment of the new counties, by the act of December 18, 1832, before referred to, it became the duty of the legislature of this State, in compliance with the provisions of the constitution, before referred to, to divide the State into at least

eight judicial circuits, which was accordingly done, by an act of the legislature of this State, approved the eleventh day of January, 1833.

. That on the 11th day of January, 1833, the respondent was duly elected, by a joint vote of the general assembly of this State, to the office of judge of the eighth judicial circuit of this State; and, by virtue of the election so made, he claimed to hold, and exercise, and did hold and exercise the said office.— The respondent alleged, that he was under the age of seventy years, and resided within the limits of the said circuit.

The respondent admitted that he was a member of the house of representatives of this State, for the county of Dallas, at the time when he was so elected to the said office, and that the time for which he had been elected a member, had not expired at the time he was so elected judge of the eighth judicial circuit. He also admitted that he was a member of the same house of representatives, when the several acts of assembly before referred to, were passed.

The respondent having shewn to this Court these causes, prayed that the said rule might be discharged.

The case was argued at length, by *Goldthwaite* and *Gordon*, on the part of the respondent; and by the *Attorney General* and *Hopkins*, in behalf of the State.

SAFFOLD, J.— Application was made by the Attorney General, at the last term of this Court, for leave to file a writ of *quo warranto* against the defendant, who was, and still is in the exercise of the duties of judge of the Circuit Courts of the eighth

judicial circuit. The object of the proceeding is to try the constitutionality of his appointment.

The application is founded on representations, in substance, as follow: That the defendant was a member of the house of representatives, during the session of the general assembly, at which the act passed, entitled "an act to alter and establish the judicial circuits of this State"—approved on the 11th day of January, 1833; and by which, said eighth circuit was created or established. That, at the same session, and during the term for which he had been elected to the legislature, as aforesaid, he was elected by a joint-vote of the general assembly, to fill said office; which, having been done under the circumstances aforesaid, was unconstitutional and void.— That he was ineligible to said office, under that provision of the constitution of the State, which declares, that no senator or representative shall, during the term for which he shall have been elected, be appointed to any civil office of profit, under this State, which shall have been created, or the emoluments of which shall have been increased, during such term; except such offices as may be filled by elections by the people." That, notwithstanding his disqualification as aforesaid, he became a candidate, was elected and has entered on the duties of judge, aforesaid, regardless of said constitutional disqualification.

Upon this application the Court then granted a a rule on the defendant, requiring him to shew cause, why the said writ of *quo warranto* should not issue, for the cause aforesaid.

Having received notice, the defendant appears, by counsel, and contests the issuance of the writ.—

Though the question now presented, is preliminary
to that which would arise on a hearing of the writ of
*quo warranto*, or an information, in the nature there-
of, it is one, involving the merits of the case. The
granting the writ would indicate the opinion, (sup-
posing the facts truly stated,) that the interposition
of the judiciary is demanded, in defence of the con-
stitution. A denial of it would exempt the defen-
dant from further molestation from this source.

The case has been argued by the counsel on each
side, with zeal and ability, equal to the importance
of the occasion. The points embraced by the argu-
ment, and authorities referred to, so far as necessary
to be noticed, according to the views we have taken
of the case, may be resolved into the following :

1. Is the writ of *quo warranto* the appropriate re-
medy, to test the right of an incumbent to the office
he is exercising ?

2. Has this Court jurisdiction to award the writ,
for such a purpose ?

The constitution of the State, (Art. 5, § 2,) pro-
vides that, " the Supreme Court, except in cases oth-
erwise directed by this constitution, shall have ap-
pellate jurisdiction only, which shall be co-extensive
with the State, under such restrictions and regula-
tions, not repugnant to this constitution, as may, from
time to time, be prescribed by law : provided, that
the Supreme Court shall have power to issue writs
of injunction, mandamus, *quo warranto*, habeas cor-
pus, and such other remedial and original writs, as
may be necessary to give it a general superinten-
dance and control of inferior jurisdictions."

I consider it unnecessary to investigate the dis-

tinction between a writ of *quo warranto*, and an information in the nature thereof. It was not urged in argument; and under this rule the Court would be competent to grant the writ, in either form that the nature of the case might be found to require, should either appear proper.—*Dew* vs *Judges of Sweet Springs.*[a]

On this point, it is sufficient to remark, that an information in the nature of a *quo warranto*, has, in modern practice, superseded in a great degree, the ancient writ, which, in its nature was a method of criminal prosecution, as well to punish the usurper, by a fine for the usurpation of the franchise, as to oust him from it. The information has subsequently been applied to the mere purpose of trying the *civil* right, seizing the franchise, or ousting the wrongful possessor, the fine being nominal only.[b]—*The People* vs *Utica Insurance Company.*[c]

The granting the writ was formerly considered a matter of right—consequently defendants were not expected to disclose the ground of their defence, on the motion made to obtain it; the more prudent course was not to do so: but, by a later mode of proceeding, now of long standing, the practice has been to let the granting this writ depend on the sound discretion of the Courts, according to the particular circumstances of the cases which may be brought before them.—*The People* vs *Sweeting.*[d]

Where the right to the franchise is disputed, and turns on a point of new or doubtful law; or, where there is no other remedy for the violation of an individual right, it is usually granted.

That this writ has been sufficiently established, as

a 3 Hen. & Munf. 1.

b 2 Inst. 281; Pl. 12; 3 Burr. 1817

4 Term R. 381

c 15 Johns. 386

d 2 Johns. R 184

the proper remedy against one who has intruded into an office without competent authority, as well as in other cases of usurpation of a franchise, is clearly shewn, not only by a series of English cases, but also by various American decisions.[a] It is true that in many cases in England, in New-York, and other States of the Union, the remedy, by information, in the nature of a *quo warranto*, has been regulated by statute; but without such aid, it exists as an adequate remedy at common law, in various other cases. I, therefore, think, so far as it is proper for the judiciary to interfere in the present case, there is no objection to the form of the proceeding, as commenced.

*a* 3 Johns. C. 79; 2 Johns Ch. R. 371; 15 Johns. R 358; Ala. R. 46; 2 Stew. 231

2. On one branch of the inquiry arising on the second question, I decline the expression of any definite opinion. That is, whether or not *this Court* is authorised to exercise the original jurisdiction of granting the writ, in the first instance—supposing there be no other objection than that in relation to the jurisdiction?

According to the view we have taken, that question is not necessarily involved in the present decision. It is sufficient to inquire, whether this Court is competent to revise, control and annul the appointment, even if it should be considered that the incumbent was ineligible to the office?

The making this appointment, required the exercise of a portion of the sovereign power of the State. In the distribution of this power, the constitution declares, (Art. 2, §1,) that "the powers of the government of the State of Alabama shall be divided into three distinct departments; and each of them confided to a separate body of magistracy, to wit: those

which are legislative, to one; those which are executive, to one; and those which are judicial, to another. (Sec. 2,) " That no person, or collection of persons, being of one of these departments, shall exercise any power properly belonging to either of the others, except in the instances herein expressly directed or permitted."

Again, it is said, (Art. 5, §12, that " Chancellors, Judges of the Supreme Court, Judges of the Circuit Courts, and Judges of the Inferior Courts, shall be elected by joint-vote of both houses of the general assembly." And it is also provided, (in the amendments of the constitution,) that the judges thus elected, shall hold their offices for the term of six years.

Thus, it appears, that the constitutional power of conferring judicial appointments, is vested in the two houses of the general assembly, to be exercised by joint-vote : that, though it be, in its nature, an authority not purely legislative, yet it is a power and trust expressly confided to the legislative department of the government; and that each of the other distinct departments is prohibited from exercising any superintendence or control over it, within its constitutional sphere of action.

Admitting the true intent and proper construction of the constitution to be, that no other department shall exercise or control the right of conferring such appointments ; and that there is no express restriction of the authority to adjudicate the eligibility of the incumbent—yet it is worthy of consideration, if the restriction be not implied—if the delegation of the power to one of the co-ordinate departments, to confer the right does not include the authority to de-

cide conclusively the constitutionality of the appoint-
ment, including the eligibility of the candidate they
may elect.

If the relative powers of the legislative and judi-
cial departments, in reference to *elections* by the for-
mer, could be considered analogous to those in rela-
tion to statutes, I should feel no difficulty in maintain-
ing the authority of the latter, to review and deter-
mine the constitutionality of elections, so made.—
But are the powers the same in either case ?

With respect to statutes, courts of justice can
not be neutral or passive—a conflict of rights arises
between individuals or corporate bodies, competent
to sue and be sued—one party claiming under the
constitution, and the other under a statute—one or
both must prevail, and they can not be reconciled;
it is the province of the judiciary to construe, and
administer the law: the consequence is, that the
constitution, being the *supreme law*, it must prevail, in
preference to the statute, and the latter become a
dead or silent letter.    This, however, is not the re-
sult of any superiority in the judicial, over the le-
gislative department.    They remain co-ordinate—
each acting independently within its respective
sphere: the statute is not *repealed*, it remains in the
code of laws; and, should the same, or a higher tri-
bunal, subsequently, determine it to be consistent
with the constitution, it is subject to be enforced ac-
cordingly.

The judiciary has no direct delegation of power,
to declare an act of the legislature unconstitutional
and void—it is an incidental authority, unavoidably

5 s & p.                7

exercised, in administering the *paramount* law.   This
authority is common to the lowest and the highest ju-
dicial tribunals—to justices of the peace, as well as to
the Supreme Court; yet the arrogance would be ob-
vious, should the former attempt to control legisla-
tive appointments, in any form or manner.

Were the Courts reduced to the necessity of pass-
ing on the constitutionality of any appointment by
the legislature, their authority to decide according to
their own judgment, could not be questioned, though
they should differ from the co-ordinate department.
This necessity might arise in the case of two ap-
pointments to the same office, or of one to an office
which has no existence: and in other cases that might
be supposed.   Such is the doctrine relative to ap-
pointments by the crown of England.   In such case,
the conflict of rights, or of authority, would demand
an adjustment by judicial decision.

But the consideration which I view as a main ob-
jection to any interference by the judicial tribunals,
in a case like the present, is, that each of the co-or-
dinate departments of the government, is required by
the constitution, and genius of the government, to de-
termine its own powers—each is bound by the obli-
gation of an oath, to support the constitution, and is
presumed competent to construe it correctly, in rela-
tion to its own action.   The possibility that either
may err in its construction, does not establish the ne-
cessity for an interference by another: infallibility is
not attainable by either, and such intermedling
would tend to destroy the harmony, which is essen-
tially necessary between the departments.

A judicial decision, vacating the present appoint-

ment, would constitute a virtual requisition on a different department, to proceed to a re-appointment— this might be refused, a collision between the departments be created, a consequence of which would be to obstruct or deny the administration of common justice.

The fact that subordinate officers, and the members of all inferior jurisdictions, are required in like manner to support the constitution, does not secure to them the same independence that is incident to the *co-ordinate departments* of the government: their construction of the law, whether constitutional or statutory, and all their proceedings, are subject to the revision and correction of the superior judicial tribunals. The constitution of the State expressly authorises this Court, to issue all such "remedial and original writs as may be necessary to give it a general superintendence and control of *inferior jurisdictions*," not co-ordinate departments. The exertion of the power here applied for, would be the exercise of a superintending and controlling authority over, not only the incumbent in office, but the appointing power.

In the case of *Marbury* vs *Madison*,[a] the Supreme Court held that a *mandamus* might issue against the Secretary of State of the United States, to enforce a delivery of a commission, or a copy thereof, where the appointment had been consummated by the President. But this authority was maintained on the principle, that the act to be done, was one affecting the absolute right of an individual, in the performance of which, the Secretary was not placed under the particular direction of the President, and which

[a] 1 Cranch, 137

the President could not lawfully forbid., and, therefore, was not presumed to have forbidden.

Here can be no evasion, as respects the power sought to be controled. It is no other than the direct appointment of the legislature, which is intended to be annulled. The powers and duties of the legislative department are no less distinct and independent of the judiciary, than those of the executive ; nor can this supposed right of interference be better founded, than if the appointment had devolved on the executive of the State, and he had made it, as the legislature has done.

In the case last referred to, Chief Justice *Marshall* says, in reference to the controling power of the judiciary, over the appointing power, (which, in that case, as we have seen, was the executive,) " It is scarcely necessary for the Court to disclaim all pretension to such jurisdiction—an extravagance so absurd and excessive, could not have been entertained for a moment. The province of the Court is solely to decide on the rights of individuals—not to inquire how the executive or executive officers perform duties, in which they have a discretion. Questions, in their nature political, or which are, *by the constitution and laws, submitted to the executive, can never be made in this Court.* But, if this be not such a question— if so far from being an intrusion into the secrets of the cabinet, it respects a paper which, according to law, is upon record, and to a copy of which the law gives a right, on the payment of ten cents : *if it be no intermeddling with a subject, over which the executive can be considered as having exercised any control,* what is there in the exalted station of the officer,

which shall bar a citizen from asserting, in a Court of justice, his legal rights; or shall forbid a Court to listen to a claim, or to issue a *mandamus*, directing the performance of a duty, not depending on executive discretion, but on a particular act of congress, and the general principles of law?"

The case supposed in argument, by the counsel for the defendant, is believed to present a fair test of the principle contended for in behalf of the State. It is, that one, two, or all the members of this Court had been elected to their present situation, under the same circumstances which attend the election of the present defendant: could the judiciary investigate, revise and control the appointments? I conceive not: besides the difficulty in selecting the revising tribunal, the matter to be controled, would have been the exercise of a sovereign political power, by one of the highest departments of the government; and one involving no conflicting individual rights, presenting a judicial question.

On the same principle, I conclude this Court has no authority to control the appointment which has been made; and it would be supererogation in us, to express an opinion, respecting its constitutionality.

The Court being unanimous in the result, the rule must be discharged.